THE VULCAN DETINNING COMPANY, appellant,

*v.*

AMERICAN CAN COMPANY et al., respondents.

[Argued November 22d, 1906. Decided July 2d, 1907.]

1. The maxim, "One who comes into equity must come with clean hands," is based upon conscience and good faith, and the bad faith or the unconscionable conduct that will justify the application of this maxim must be based upon actual knowledge or willful fraud. The fraud of an agent that is by mere imputation chargeable upon a complaint will not render the hands of the latter unclean within the meaning of this maxim.

2. "Unclean hands," within the meaning of the maxim of equity, is a figurative description of a class of suitors to whom a court of equity, as a court of conscience, will not even listen, because the conduct of such suitors is itself unconscionable in the moral sense that imports actual knowledge.

3. The complainant purchased from a concern in Holland a process for the successful detinning of tin scrap which was unknown in this country, the secret of which is zealously guarded. After the success of the process had been demonstrated, one of the complainant's original directors, charged as such with the duty of secrecy, and who moreover held in individual trust for the complainant a copy of the formula of its process, became the president of the defendant corporation, and, with the assistance of certain discharged employes of the complainant, installed for the defendant corporation, as a competitor of the complainant, the process so purchased by the latter. Upon a bill filed to enjoin this inequitable competition, and to restrain the further publication of the complainant's process—*Held*, (1) that the quondam director of the complainant should be enjoined because of his breach of trust; (2) that the defendant corporation should be enjoined because the knowledge of its president was imputable to it; (3) that the discharged employes of the complainant should be enjoined under the rule laid down in this court in the case of *Stone* v. *Goss*, 65 *N. J. Eq.* (*20 Dick.*) 756. *Held, also*, that, assuming that the complainant had not acquired a title to its process that was good as against the discoverer thereof, and also that the process itself was not absolutely a secret one, the complainant, upon general principles of equity, is entitled as against its wrong-doing trustee, and others chargeable with notice, to protect the qualified secrecy of such process that arose from such relation of trust and confidence.

4. The knowledge of an agent, casually obtained, is chargeable to a principal by whom he is afterward employed whenever the principal, if acting himself, or (if a corporation) when acting through some other agent, would in the natural course of events have acquired the knowledge or have been put upon such inquiry as was the equivalent of notice.

5. The case of *State* v. *Sooy*, 41 *N. J. Law* (*12 Vr.*) 394 approved and applied. The case of *Willard* v. *Denise*, 50 *N. J. Eq.* (*5 Dick.*) 483, overruled.

6. If a trustee purchase a title that cures or completes one that he holds in trust, the presumption in equity will be that the later purchase was made in aid of the former trust.

On appeal from a decree of the court of chancery, advised by Vice-Chancellor Bergen, whose conclusions are reported in *70 N. J. Eq.* (*4 Robb.*) *588.*

*Mr. Robert H. McCarter*, attorney-general, and *Mr. Henry Wollman* and *Mr. Albert S. Seidman* (of the New York bar), for the appellant.

*Mr. Richard V. Lindabury*, for the respondents.

The opinion of the court was delivered by

GARRISON, J.

The bill of complaint in this case was dismissed by the court of chancery upon the sole ground that the complainant did not come into court with clean hands. The facts upon which this determination rests, as stated in the conclusions of the learned vice-chancellor, are briefly these: The process which it was the object of the complainant's bill to enjoin the defendants from using or making public was the discovery of the Goldschmidt Brothers of Germany, and was as early as the year 1891 in successful operation at their factory in Essen, Germany, where it was guarded by its discoverers as a secret process. A large part of the tin scrap used by the Goldschmidts at this factory was shipped to them from New York by the firm of A. Kern & Company, of which Adolph Kern was the head. As early as 1892 the advantages of the erecting of a detinning plant in this country were seen by Mr. Kern and led him to enter into an extended correspondence upon the subject with the Goldschmidts, which culminated in the submission to them of a proposition looking to the establishment of their process in this country under a corporate enterprise in which they should take stock. After considerable correspondence this proposition was definitely declined by the Goldschmidts by a letter of May 7th, 1897, the concluding paragraphs of which are as follows:

"When one considers further that detinning is much dearer in America than here, as wages are higher and chemicals more expensive, it is clear that an establishment in America cannot compete with those in this country. I consider, under these entirely changed conditions, the establishment of a factory over there is a mistake, and not able to exist, and consequently I will not take any part whatever in such an enterprise.
"Very respectfully,
"TH. GOLDSCHMIDT."

In the course of this correspondence Dr. Goldschmidt had in a letter of May 16th, 1896, stated that his process was being used at Vlissingen, Holland, by a concern called the Tinfabriek which had been organized for this purpose by one Laernoes, who had clandestinely obtained the secret of the process. It does not

appear that Kern ever communicated this piece of information to anyone except to Laernoes himself some two years later. From this time both of these detinning plants, namely, the Goldschmidts at Essen and the Tinfabriek at Vlissingen, drew upon this country for their shipments of tin scrap, and as a great part of this refuse material was obtained by Kern from the tin can factories near New York, the attention of the proprietors of these factories was also directed to the desirability of having a detinning plant of their own if the process of its successful operation could be obtained. This community of interest brought together Kern and these manufacturers, and resulted in a tentative agreement for the promotion and financiering of such a project, provided the process used by their foreign customers could be obtained by negotiation. This matter was entrusted to Kern, who, knowing from his correspondence with the Goldschmidts that they regarded the enterprise as entirely unfeasible, went directly to Vlissingen (of which the English name is Flushing) and there met Laernoes and ascertained from him the terms upon which the co-operation of the Tinfabriek could be had. This was in 1898. An option embodying these terms was secured by Kern, who, after visiting other factories at Kempen and Uerdingen where less productive processes were used, went to Essen in a final endeavor to enlist, if possible, the Goldschmidts in the American venture, but without success. The net results therefore of Kern's visit to Europe was his option with the Tinfabriek, which, upon his return to New York, he accepted in the name of A. Kern & Company, with whom it had been made, and later transferred to the Vulcan Metal Refining Company, a corporation of this state, and one of the underlying companies of the present complainant.

Under the terms of this executed option the Tinfabriek installed the process in question at two factories of the complainant in this country, receiving therefor in cash and capital stock a sum approximating $200,000.

To restrain the defendant Assmann (who was one of the original corporators who made this purchase) and the defendant corporation of which he is president from using or making public

this process in violation of an alleged trust between Assmann and the complainant is the main object of the present bill.

From these circumstances and others detailed by the learned vice-chancellor he reached the conclusion that the process used by the Tinfabriek was a fraud upon the Goldschmidts, of which Kern by reason of his correspondence with Dr. Goldschmidt in 1896 had knowledge, and that when Kern, in 1898, became the agent of the corporators of the complainant through whom the Tinfabriek process was acquired, the prior knowledge Kern had thus casually obtained must be imputed to the complainant under the decision of this court in the case of *Willard* v. *Denise, 50 N. J. Eq. (5 Dick.) 482.* Having reached this conclusion as to the imputation of Kern's knowledge to the complainant, the vice-chancellor further concluded that the effect of such imputation was to render the hands of the complainant unclean within that maxim of equity by which a deaf ear is turned to a suitor in a court of conscience regarding a matter in respect to which his own conduct has been unconscionable.

In reaching this last conclusion the learned vice-chancellor fell, we think, into the error of ascribing an unconscionable status to the complainant by force of a presumption of remedial law that in its most extreme application affects only the legal rights of parties and not at all their moral standing. That the knowledge possessed by an agent, but not acquired by him while acting for his principal, will under certain conditions be imputed to the latter, is in the nature of a presumption indulged in by courts in working out the rights of litigating parties. It is never a rule of evidence by which the actual possession of knowledge by the principal can, in point of fact, be established. On the contrary, an essential part of the presumption in question is that the principal is ignorant of the knowledge that has been casually acquired by his agent; hence, by the hypothesis, the principal is not only ignorant of the knowledge thus acquired, but if such knowledge involves a fraud, the principal is innocent of such fraud. True, he may be bound by it in the sense that his legal rights may be determined with reference to the knowledge with which he is thus chargeable, but his conscience is void of offence, and hence it cannot with any propriety be said

that his hands are unclean, for "unclean hands" within the meaning of the maxim of equity is a figurative description of a class of suitors to whom a court of equity as a court of conscience will not even listen because the conduct of such suitors is itself unconscionable, *i. e.,* morally reprehensible as to known facts. The entire ineptitude of the presumption respecting imputed knowledge to relegate the complainant in the present case to this reprobated class must, we think, be apparent. As was said by the Kentucky court of appeals, speaking through Mr. Justice Burnham (afterward chief-justice) : "The maxim, 'one who comes into equity must come with clean hands,' is based upon conscience and good faith." *American Association* v. *Innis, 109 Ky. 595.*

Upon the ground stated we think that the learned vice-chancellor committed error, without regard to the pertinence of the maxim of clean hands, to the knowledge that he imputed to the complainant or to the propriety of such imputation.

Our conclusion as to this branch of the case leads to the reversal of the decree below, unless the respondents are entitled to hold the decree upon the merits of the case which the court below because of its ruling as to the complainant's status did not find it necessary to pass upon, but which on this appeal counsel on either side have had the prevision to argue with great fullness.

The testimony taken in the case although very considerable in extent does not present any especial difficulty as regards the material facts. Stated succinctly and in unargumentative form the facts as we find them to be from the testimony are these : Prior to 1898 the detinning of tin scrap had not been successfully carried on in this country for the reason that the process by which such waste material could be so treated that both the iron and the tin, of which it is composed, could be separated and made commercially profitable was unknow here. Such a process was, however, in successful operation at Vlissingen, in Holland, by a concern called the Tinfabriek, a fact that was known to shippers and dealers in tin scrap in this country, among whom were Adolph Kern, a shipper, and Franz A. Assmann, a manufacturer, and to others in the same line of business. These dealers also knew

that detinning was carried on at Essen, in Germany, but Kern alone knew, from the private sources already referred to, that the Goldschmidts claimed that they were the originators of the process and that the Vlissingen concern had pirated their secret. The legitimate profits of detinning, at a home plant, the tin scrap that was thus being exported to Europe induced these American dealers in that material, in the year 1898, to agree amongst themselves to subscribe the necessary capital to financier such an undertaking in corporate form, if the secret of the process that was being successfully operated abroad and the right to use it could be obtained. This mission was entrusted to Kern, whose visit to Europe, on this errant, has already been alluded to. The practical result of Kern's mission, so far as the promoters of the proposed corporation are concerned, was that it was successful and was followed up immediately by the execution of the option that Kern had obtained with Tinfabriek and the installation by that concern of two detinning plants for the American corporators, for which the Tinfabriek received in cash and capital stock, that was soon worth more than par, a sum that fell little short of $200,000. The rights of the two corporations, for which these plants were originally installed, have since been acquired and are now represented by the complainants. Of the good faith of the American corporators in the transaction which involved the payment of this large sum of money no legitimate doubt is raised by the testimony. Whether the prior knowledge possessed by Kern made his conduct fraudulent as to the Goldschmidts so that in a suit brought by them such fraud would be imputable to these corporators is a question that does not concern this present controversy. It should be noted, however, that there is a wide difference between the absolute secrecy which the discoverer of a process has the legal right to protect and the qualified secrecy which the complainant claims the equitable right to secure. That the complainant carefully guarded such secret as it had acquired is amply proved in the case; that Assmann as one of the original promoters and one of the first directors of the complainant was especially impressed with the importance of so guarding the process is shown in the testimony in many ways, one only of which need now be mentioned, namely,

that he himself became, individually, the depository of a copy of the formula of the process for the express purpose of guarding it for the mutual benefit of himself and his associates. The enterprise conducted upon these lines was from the very first a success, both practically and commercially, and so continued until the year 1901, in which year Assmann transferred his personal business as a manufacturer of tin cans to a corporation created in that year, namely, the American Can Company, the defendant corporation in the present suit. Upon the organization of this company, Assmann became its president, sold out all of his holdings of stock in the two detinning companies, resigned his directorship in each, and became the leading spirit in the installation for the American Can Company of two plants using a process of detinning similar to the complainant's, having called to his assistance for this purpose three former employes of the complainant, who, together with Assmann and the American Can Company, are the defendants to the present bill.

The testimony admits of no other rational conclusion than that the detinning plants that thus came into existence in competition with the complainant's are employing the process originally purchased by the complainant, which Assmann had undertaken to safeguard in its interests. That this result was brought about by a breach of confidence upon Assmann's part toward his original associates both as regards the use of the process itself and the enticement of the former employes of the complainant into his scheme is also the only legitimate inference that can be drawn from the proofs; that in both of these respects he was acting directly on behalf of the defendant corporation, of which he was both president and agent, follows as a necessary deduction.

Having reached these conclusions as to the effect of the testimony, the question arises whether, upon these facts, the complainant is entitled to any relief and if so to what extent and of what nature. Counsel for the defendants, with much confidence, argues that the complainant is entitled to no relief because the secret process it seeks to enjoin the defendants from using is not in fact a secret, and secondly, because if it is a secret the legal title to such secret is not in the complainant. The perti-

nence of these propositions to the present controversy depends, to
a great extent, upon the precise nature of the equitable relief
the complainant is warranted in claiming.  When the complain-
ant's bill was filed in the court of chancery, it was immediately
challenged by the defendants by a demurrer upon the claim that
no grounds for equitable relief were disclosed by the bill.  The
pleading thus directly attacked was sustained in a carefully con-
sidered opinion by Vice-Chancellor Reed, an examination of
which will show that the propositions now relied upon by the
respondents were substantially the grounds then advanced and
disposed of in the court below.  *Vulcan Detinning Co.* v. *Ameri-
can Can Co., 67 N. J. Eq. (1 Robb.) 243.*

The conclusion set out in the opinion of Vice-Chancellor Reed
need not be here rehearsed, since it is sufficient for present pur-
poses to say that their general purport was that inasmuch as
neither party stood in the shoes of the discoverer of the secret pro-
cess, and as the complainant was not claiming under the Gold-
schmidts but under the Tinfabriek, the rights that the former
might set up would not avail the defendants to justify a breach of
trust toward the complainant respecting a matter that, so far as the
parties before the court were concerned, was traceable to a com-
mon source—in fine, that the equity of the bill rested upon prin-
ciples generally applicable to trusts and not upon rights peculiar
to the discoverer of a secret process.  After this conclusion was
filed, namely, June 13th, 1904, an assignment and license from
the Goldschmidts to the defendant corporation, dated October
17th, 1904, was made.  The effect of this instrument was, of
course, not directly involved in the decision in question, but as
far as it went the decision was the law of the case and placed
the equity of the bill upon an alleged breach of confidence re-
specting a secret process and not upon any inherent property in
such process.

Looking now a little more closely at the nature of the relief
called for by the complainant's case, which we are not enabled to
do in the light of the issues that have been actually tried, we shall
see, I think, that too much emphasis has perhaps been placed
upon the element of absolute secrecy in the process, and that
not enough stress has been laid upon the inequitable character

of the defendant's conduct in making a use of such process that was inimical to the complainant's interests.

What I wish to point out is that the real gravamen of the complainant's bill, as amplified in the proofs, is not that the defendants are threatening to destroy the value of an absolutely secret process by imparting it to the public, but that the defendants, while keeping the secret of the process to themselves, are making a use of it that is inequitable as to the complainant, as shown by the testimony, and the complainant ought to be protected from the inequitable competition to which it has been exposed by a breach of confidence. Incidental to this relief, and resting upon the same equitable jurisdiction, is the restraining of the defendants from publishing the process itself, of which, however, there is no proof of any present threat or intention. Indeed, as long as the present state of affairs exists, such publication would be equally injurious to both parties and for the same reason, namely, because of the competition to which it would expose the business in which each is at present engaged. I am not suggesting that the complainant is not entitled to an injunction enjoining publication, for I think that it is, but I am now saying that the main ground for relief disclosed by the complainant's case is the existence of inequitable competition arising from a breach of trust, and hence referable to general principles of equity and not to those special doctrines by which unpatented secrets are protected. In the application of these general principles the secrecy with which a court of equity deals is not necessarily that absolute secrecy that inheres in discovery, but that qualified secrecy that arises from mutual understanding and that is required alike by good faith and by good morals. It is proper to say here that the plea that absolution should be granted by courts of equity from the observance of such private obligations whenever the public will thereby be the gainer cannot for a moment be entertained. The language of Justice Brown, cited in the brief of counsel, namely, "It is as important to the public that competition should not be repressed by worthless patents as that the patentee of a really valuable invention should be protected in his monopoly," has, as I read the case of *Pope Manufacturing Co.* v. *Gormully, 144 U. S. 224,* no such im-

port in the context in which it stands in Mr. Justice Brown's opinion. The notion that the multiplication of worthless patents inflicts as great an injury upon the public as the multiplication of worthless citizens would do can never, I fancy, be accepted by a court of equity as a sound proposition on which to base a doctrine absolving trustees from the observance of their trusts.

The conclusion to which the foregoing considerations lead is that entirely aside from the technical secrecy of the process or the abstract question of property therein, the complainant is entitled to have its trustee, his associates and their servants restrained from using against the interests of the complainant the very process with which its trustee was entrusted for its benefit. It is further worthy of note upon this question of the secrecy of the process that apart from the peculiar rights of its discoverer, the secrecy of a process may be viewed in two aspects, *first,* as having for its object the keeping of the public in ignorance of the nature, source or composition of a commercial product that is put upon the market; and *second,* as having for its object the prevention of competition by rivals in production. The first of these aspects has sole regard to the public as prospective purchasers, the second has reference solely to rivals in probable competition. In the case before us publication by the complainant's trustee would, of course, violate the obligation of secrecy in each of these respects, but as regards the second, namely, prospective competition, such trust is equally violated if the trustee himself uses the secret to engage in such competition, even though, as would clearly in that case be to his interest, he sedulously kept the secret to himself excepting so far as his selfish use of it required the co-operation of associates and servants. To this the trustee might indeed answer, "It is true that I agreed to keep your secret from others, but I did not agree that I would not myself make use of it in competition with you." But it is not likely that a court of equity would regard such answer as in anywise ingenious or exculpatory. The present case rests, as it seems to me, largely upon the distinction thus indicated. The secrecy maintained by the original purchasers of the process in question was not in order that the public might not know what it was buying, but that the profits of production

should not be cut by rivals. It was unquestionably to this end that the process was sedulously guarded by Assmann and his original associates and by Assmann as a personal trustee of its formula. When therefore Assmann severed his connection with the complainant and installed the process in question for the defendant corporation as a competitor in production, it is the same in equity as if without having severed such prior connection he had broken faith with his fellows by imparting to a rival the secret which he had promised to preserve. The jurisdiction of equity in such case, whether the breach of trust be actually beneficial to the wrong-doing trustee or only injurious to his *cestui que trust,* is too familar to justify the citation of authorities.

This being so, as to the defendant Assmann, the complainant contends that the same facts and the same equitable doctrine require that the same relief be decreed against the defendant corporation, for whom Assmann was acting when he did the acts that constitute his breach of trust with the complainant. This contention is undoubtedly correct if the defendant corporation knew or had notice that Assmann held the secret of the complainant's process in a confidential or trust capacity, for in that case it became itself a trustee for the complainant, at least to the extent of being enjoined from using the process or making publication of it. It is all but impossible to avoid the conclusion that the directors of the American Can Company had actual knowledge of sufficient facts to constitute such notice. The community of interest in the tin scrap trade, the sudden cessation of the wholesale exportation of such scrap, the new domestic market opened for it by the establishment of the complainant's plants, the fact that the complainant, alone in this country, was able, successfully, to treat the scrap, and the personal knowledge of the actual facts by some of the leading spirits in the organization of the defendant company, almost compel the conclusion that the history of the complainant's process and of Assmann's connection with it were known to the management of the American Can Company when it ventured its capital in the enterprise engineered by its president. It is all but impossible to demonstrate, by direct proof, that a corporation has knowledge apart

from the knowledge possessed by the agencies through which its functions are performed; hence, the mere fact that the complainant is unable to adduce any corporate resolution of the defendant expressly asserting its knowledge of the complainant's secret and of Assmann's connection therewith does not prevent our reaching the conclusion that the defendant had such knowledge, if such is the inference to which the testimony, by irresistible weight of probability tends. Had these facts been found by the court below, where the witnesses were orally examined, and the testimony reviewed *in extenso* by counsel, I can see no ground upon which such finding could be reversed. The circumstance that we are now required in the first instance to find this important fact from a mass of printed testimony, occasions the only hesitation I feel in deciding this question adversely to the respondents without first looking at the case as it would stand if proof of actual notice were admittedly lacking.

The doctrine invoked by the complainant upon this latter assumption is that a constructive trust arises where one receives trust property without actual notice of the trust, but also without paying for it a valuable consideration. By force of this doctrine it is claimed that the defendant corporation became a trustee of the complainant because it did not pay a valuable consideration to Assmann for the secret process he installed for it. The difficulty in the way of applying this doctrine to the facts of the present case is that, while the American Can Company did not pay anything to Assmann, it did expend large sums of money in exploiting the process he secured for it, and this expenditure if innocently made, that is, if made without notice, would constitute an equitable consideration that would take the case out of the doctrine that is thus invoked. So that upon the assumption that the can company did not have actual notice of the circumstances that constituted its president's breach of confidence with the complainant, it is not amenable to the relief the complainant now seeks, unless by force of Assmann's agency in procuring the process for it, such knowledge as he possessed is by imperative presumption to be imputed to the defendant corporation. The nature of this presumption has been incidentally referred to in an earlier part of this opinion, where, how-

ever, it was found necessary to say no more than that being a rule of remedial law, such presumption had no application to the maxim of clean hands. Now, however, in applying this presumption to the remedy claimed by the complainant against the defendant corporation, we are called upon to consider it in its proper function.

The scope, and to some extent, the theory of the presumption of imputed knowledge has been the subject of two decisions in this court which are not in accord. I refer to *State* v. *Sooy, 41 N. J. Law (12 Vr.) 394,* and *Willard* v. *Denise, 50 N. J. Eq. (5 Dick.) 483.* The latter of these cases which was also the later in point of time, laid down the rule that

"Where information is casually obtained by an agent of a corporation, the corporation is not charged with notice from the mere fact of its agent's knowledge, but if the corporation act through such agent in a matter where the information possessed by him is pertinent, the knowledge of the agent will be imputed to the principal."

Under the rule thus stated the defendant corporation is clearly chargeable with notice of all the pertinent information possessed by Assmann and used by him in its behalf. We are not, however, willing to rest our decision of this matter upon the case of *Willard* v. *Denise*. In the earlier case of *State* v. *Sooy*, the rule stated in the syllabus of the opinion, delivered by Mr. Justice Dixon, is this:

"The knowledge of the agent is chargeable upon his principal whenever the principal, if acting for himself, would have received notice of the matters known to the agent."

This rule, it will be observed, is far more favorable to the respondents in the present case than that of *Willard* v. *Denise,* and is, in our judgment, the rule to be applied whenever the presumption of imputed knowledge becomes pertinent to the rights or remedies of litigating parties. By force of this rule and of the reasoning upon which it rests, the American Can Company is chargeable with the knowledge possessed by Assmann only in case the principal, that is, the can company, if acting for itself in the acquisition of the complainant's process, or (being a corpo-

ration) if acting through some other agent, would have received notice of the material matters known to Assmann. In applying this rule we think it is reasonably certain that if the board of directors of the American Can Company, when they contemplated going into competition with the complainant in the detinning business, by use of its process, has set about the acquisition of a practical knowledge of the construction and working details of such process, either as a board of directors or by the employment of agents not already possessed of such knowledge, they must inevitably have run up against the barrier of secrecy maintained by the complainant for the express purpose of heading off such competition. In that case they would either have failed to obtain the secret of the complainant's process except with its knowledge and consent, or if they did obtain it clandestinely from someone who held it in confidence, would have done so under circumstances that would have put them upon inquiry, and hence, have charged their corporation with whatever knowledge such inquiry would have led to. This is the test established by the case of *State* v. *Sooy* (as applied to a corporation) and the conclusion to which it leads is that the defendant corporation holds the fruits of Assmann's agency in its behalf, with the burden of so much of the knowledge possessed by him as would have come to it if it had acted for itself or through an agent who was not already possessed of such knowledge.

Being chargeable with this notice, the defendant corporation is amenable to the same decree touching competition and publication as that already accorded to the complainant with respect to Assmann individually. The inadequacy of the protection afforded to principals generally and to the defendant corporation in this case by the rule stated in *Willard* v. *Denise,* having been necessarily considered by us in reaching the conclusion that the doctrine of the case of *State* v. *Sooy* should by preference be adopted, the former case must be deemed to be overruled.

Any consideration of the defence set up under the assignment to the defendant corporation of the Goldschmidt process would clearly have been premature as long as the equitable rule applicable to the case was undetermined. This assignment was dated October 17th, 1904, that is to say, it was after the filing of the

opinion of Vice-Chancellor Reed overruling the defendant's demurrer and before the filing by the defendants of their supplemental answer. At the time the assignment was thus taken the defendants were fully apprised by the bill of complaint, if in no other way, of the precise nature of the complainant's claim to relief. The decision we have reached carries with it the defence that is thus sought to be set up under this assignment, upon the doctrine that if a trustee purchases a title that cures or completes one that he holds in trust the presumption in equity will be that the later purchase was made in aid of the former trust. *McCormick* v. *Ocean City Association, 45 N. J. Eq. (18 Stew.) 561.*

The complainant's counsel goes so far as to claim that under the rule thus stated the defendant corporation should be decreed to assign the Goldschmidt license to the complainant upon the payment by it of the $10 paid to Goldschmidt for such grant. Whether such relief should be decreed in a suit to which the Goldschmidts are not parties need not be now decided. It is sufficient to hold in the present case that such assignment is of no avail to the defendants.

If further relief in this behalf becomes necessary application for that purpose may be made to the court of chancery.

The case against the defendants, Schmaal, Bauman and Egbert, as servants of the defendant corporation, follows the decision against that corporation as far as a continuance of its inequitable competition is concerned. In regard to future abstinence from both competition and publication, these defendants, as former employes of the complainant, are brought by the testimony within the rule laid down by this court in the case of *Stone* v. *Goss, 65 N. J. Eq. (20 Dick.) 756.*

Against all of the defendants therefore the relief prayed for in the complainant's bill should be decreed by the court of chancery with the single exception of the prayer for an accounting, which matter not having been argued before us may, with greater propriety, be disposed of in the court below upon the remission of this record.

To this end the decree of the court of chancery is reversed.

*For affirmance*—Swayze, Bogert, Vroom, Green—4.

*For reversal*—The Chief-Justice, Garrison, Fort, Hendrickson, Pitney, Reed, Trenchard, Vredenburgh, Gray, Dill—10.