29 N.J. Super. 361 (1954)
102 A.2d 90
SUN DIAL CORPORATION, A CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
CARL D. RIDEOUT, JAMES L. RIDEOUT, ROBERT A. WHITFIELD, NANCY ORI WHITFIELD AND PRECISION MARKING CO., A CORPORATION OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1953.
Decided January 6, 1954.
*364 Before Judges CLAPP, GOLDMANN and EWART.
Mr. Ira Milton Jones, of the Wisconsin Bar, admitted pro hac vice, argued the cause for appellant (Messrs. Davidson & Miniutti, attorneys).
Mr. Walter D. Van Riper argued the cause for respondents (Messrs. Van Riper & Belmont, attorneys).
The opinion of the court[*] was delivered by GOLDMANN, J.A.D.
Plaintiff brought this action for an injunction to restrain the individual defendants, who were its former employees, and the corporate defendant which they had formed, from using or disclosing to others certain secret methods, processes and information which they had learned and acquired while in plaintiff's employ. An accounting, award of profits and other proper relief were also sought. The Chancery Division dismissed the complaint for the reasons that plaintiff's process was not a secret one, plaintiff did not tell defendants it was secret, and there was no confidential relation between plaintiff and defendants during their period of employment as to their use and operation of the processes. Sun Dial Corp v. Rideout, 25 N.J. Super. 591 (Ch. Div. 1953).
Plaintiff corporation was organized in 1943 by William J. Williams, Jr., its president, for the purpose of manufacturing *365 precision dials and panels by means of a secret process alleged to have been developed by him. Williams had previously worked for Linotone Corporation, a company that made similar products. Plaintiff's plant is presently located at Caldwell, New Jersey, in a new building first occupied in October 1948. The individual defendants had all been employed by plaintiff before leaving it in a group to establish defendant corporation in 1951. That company immediately began to manufacture dials in competition with plaintiff. Many of its employees were formerly employed by plaintiff. Defendants admitted having acquired their knowledge of dial-making while in plaintiff's employ, and that the process they are using is like the Sun Dial process in all material respects, differing only in insignificant details. The court found as a fact that defendants are using plaintiff's process. There were no written agreements between Sun Dial and the individual defendants by which the latter agreed to refrain from using plaintiff's methods and process and not to disclose them to others.
Generally, the law implies from the relationship of employer and employee an obligation on the part of the employee not to disclose to others or use to his own advantage and to the detriment of his employer any secret process, trade secret or confidential information concerning his employer's business which has been disclosed to him or of which he has gained knowledge in the course of his employment. And that is true regardless of the existence of any express agreement. 35 Am. Jur., Master and Servant, § 97, p. 525; 4 Restatement, Torts (1939), § 757, pp. 1 et seq.
We must first determine whether there was in fact a trade secret owned and used by plaintiff. Stone v. Grasselli Chemical Co., 65 N.J. Eq. 756 (E. & A. 1903); Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387 (E. & A. 1907); Boost Co. v. Faunce, 17 N.J. Super. 458 (App. Div. 1952). There is no absolute way of determining whether something is or is not a trade secret. Some factors to be considered are the extent to which the information is known outside of the business, the extent to which *366 it is known by employees and others involved in the business, the extent of measures taken to guard the secrecy of the information, the value of the information to plaintiff and its competitors, the amount of effort or money expended in developing the information, and the ease or difficulty with which the information could properly be acquired or duplicated by others. 4 Restatement, Torts, § 757, pp. 5 et seq. A trade secret may consist of a plan, process, formula, device or compilation of information used in one's business and which affords an opportunity to obtain an advantage over competitors who do not know or use it. There must be employed creative faculties in originating it, amounting to a meritorious discovery. Boost Co. v. Faunce, above. The trade secret need not, however, be patentable. A.O. Smith Corp. v. Petroleum Iron Works Co., 73 F.2d 531 (C.C.A. 6 1934). It "may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make. Novelty and invention are not requisite for a trade secret as they are for patentability." 4 Restatement, Torts, § 757, p. 6.
In our view the subject matter of plaintiff's process was such as to constitute a trade secret. The defense tried to prove that the Sun Dial process was basically the same as the Linotone process, known to Williams in his former employment. "Basically" is found throughout the whole record, in the opinion below, and in defendants' brief. We find its use ambiguous and confusing. Defendants' contention falls when one considers the specific differences between the Sun Dial and Linotone methods. * * * Linotone's method is characterized by etching the metal surface, as contrasted with Sun Dial's surface relieving  etching cannot be done on plastic material.
Certain elements in the process followed by plaintiff should be stressed * * *. It required long and expensive research to perfect the machine, the several process operations, and the materials which are essential to the Sun Dial method. There is the instance of the paint; over $15,000 and many months were spent in research to discover a paint which *367 would meet certain defense contract specifications. Eventually, through a fortuitous inquiry at United States Radium Co., it turned out that the answer to the problem was a proprietary product, but the use plaintiff made of it was otherwise unknown in the industry. Actually, that use would run contrary to the recommendation of the manufacturer.
These admitted and uncontradicted facts impress us and lead to the conclusion that the Sun Dial process is of a character which, in appropriate cases, should be protected by our courts as a trade secret. The fact is that none of plaintiff's competitors could achieve the high degree of accuracy and fine technical finish on dials and panels that it did, even after they had gone through the plant and though they had before them the so-called Bendix specifications, much referred to in the testimony, and a certain article written by Williams for Plastics magazine, outlining plaintiff's process in a general way, but without sufficient detail to enable them to duplicate that process.
The fact that individual process steps are known to industry, and the further fact that every product used by plaintiff * * * can be bought in the open market, does not weaken the conclusion we reach. Williams, president of plaintiff corporation, was able to devise a combination of products and methods which resulted in preeminently fine dial and panel work  much like a fine chef who achieves an outstanding culinary product by a sequence of blending ingredients and by timing achieved through a long period of trial and error. Cf. Stone v. Grasselli Chemical Co., 65 N.J. Eq. 756 (E. & A. 1903).
The question whether plaintiff exercised such care to keep its process confidential as warrants a finding that the process constituted a trade secret presents a somewhat more difficult question. The trial court in its opinion said: "The employer must present a very strong case in order to secure relief by injunction * * *," citing Haut v. Rossbach, 128 N.J. Eq. 77 (Ch. 1940), affirmed 128 N.J. Eq. 478 (E. & A. 1941), and Boost Co. v. Faunce, 13 N.J. Super. 63 (Ch. *368 Div. 1951), affirmed 17 N.J. Super. 458 (App. Div. 1952). The first case was one where the court refused to restrain an ex-employee from selling to plaintiff's customers where he sold to a class whose identity was readily ascertainable, and in the second the purported secret formula was for a soft drink which could very readily be determined from analysis by those engaged in the soft drink business. The court in the Boost case said that in the absence of an agreement there must be a "strong case" before it would enjoin "the use of information honestly obtained," but the language refers to the subject matter of the secret itself and not to the precautionary measures taken to guard the secret. Here, plaintiff's alleged secret process was in no wise disclosed by the finished article itself when it appeared upon the market, as in the Boost case and in Carver v. Harr, 132 N.J. Eq. 207 (Ch. 1942).
As to the degree of secrecy required, the Restatement of the Law of Torts, § 757, pp. 5-6 states:
"Secrecy. The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. * * *"
Absolute secrecy is not required, but rather that qualified secrecy which arises from mutual understanding and is required alike by good faith and good morals. Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387, 396 (E. & A. 1907).
The testimony is in some conflict as to the precautionary measures taken by plaintiff to maintain the secrecy of its *369 process. Plaintiff's president, Williams, was supported in his testimony that steps were at all times taken to keep the process secret, and this corroboration comes from, among others, competitors. The categorical denial of the defense comes from those who were former employees of plaintiff and who are now employed by defendant. We must go behind defendants' personal attack on Williams and his alleged lack of ethics and examine specific testimony.
Much is made of the Plastics magazine article, apparently known to the entire trade. The trial court referred to its "admitted deliberate ambiguity," and we agree with the characterization. Williams purposely described the process followed by Sun Dial so as to give as little information to competitors as possible. John E. Paul, senior vice-president of United States Radium Corp., who was thoroughly familiar with the methods of making dials, testified that despite its research facilities his organization was unable to make a dial which would meet the Bendix specifications, even with the Plastics article available to it. "What was in there didn't mean much to us," he said. He was taken through the plant at the beginning of 1950 and what he saw was new and "quite amazing" to him, particularly the process of applying the photosensitive solution and the relieving process. He was not told what products were being used. Even after going through the plant, he said he could not reproduce the method. Eventually his company took a license from Sun Dial.
Richard A. Anderson, president of the Maryland Etching Co., stated that even with the Bendix specifications and the Plastics article, his organization would not be able to reprodue the process. He was impressed by the scrubbing operation * * * and with the surface-relieving process which he had once tried without success. The machine for producing masters also impressed him. His company likewise is a licensee of Sun Dial.
The court limited the probative value of this testimony, saying that the licensees "may have preferred to enter into such arrangement rather than spend the time and money *370 necessary to acquire sufficient experience to successfully duplicate plaintiff's dials." It would seem that the time and money required in obtaining experience is not the reason for taking out licenses; companies do not spend money where they are able to get at a competitor's process because it is so poorly guarded  as, for example, by an inspection tour through the plant or by talking to its employees.
Plaintiff's witness, Arthur M. Wickwire, went through the Sun Dial plant in 1945 or 1946 and testified to the secrecy surrounding the process, whose features he described as "rather unique operations." Another witness, Louis G. Lockward, testified as to secrecy precautions taken soon after the plant opened in 1943. Edward L. Beaudry was in the place in 1946 or early 1947; his testimony was unshaken that he had been cautioned to secrecy and always escorted by a Sun Dial employee when going through the processing part of the plant. Still another witness, John Van Lenten, toured the plant and was given only a general explanation of what he saw and warned about keeping information secret; however, this was in January 1951.
There were "no admittance" signs in plaintiff's plant from the beginning of the business. A sign was posted at the present plant in 1949: "Please Do Not Ask for Admittance to the Plant, As We Are Working Under a Secret Process." The trial court seems to have concluded, on the basis of only defendants' testimony, that this sign was posted for security reasons because Sun Dial had a government contract for part of the famous Norden gun sight contract. In this connection we have Williams' testimony in rebuttal, fixing specific dates based upon records which show that the sign was posted long before the Norden order or any naval security regulations came along. The same is true of the register which had to be signed by visitors and at the top of which appeared in typing the words "any process observed on these premises is considered Secret Process which I agree not to use or divulge." It may further be noted that although the sign and register refer to "Secret Process," neither refers to governmental restrictions or security requirements.
*371 The opinion below makes point of the fact that the testimony of plaintiff's principal witness was unsupported by employees upon whom it should have relied. But the court had notified plaintiff's counsel less than half-way through the trial that much of the testimony was cumulative and it was not necessary to go on duplicating the same thing. At that point plaintiff had presented only eight witnesses. The lower court also stressed the number of visitors to the plant. However, the testimony is that relatively few ever got to the processing area, and even these were under escort of a Sun Dial official or trusted employee.
We conclude, therefore, that plaintiff took reasonable precautionary measures to maintain the secrecy of its process, and that the necessary element of secrecy exists in this case. We turn to consideration of the final question as to whether there was a confidential relation between Sun Dial and the individual defendants.
None of the individual defendants ever had experience or training in the manufacture of dials or objects having precision markings before going to work for plaintiff. Each of them admitted having acquired all knowledge of dialmarking while in plaintiff's employ. Their company, Precision Marking Co., admittedly uses a process like Sun Dial's in all material respects.
While still in plaintiff's employ, several of the defendants planned to organize defendant company and to go into competition with plaintiff. They persuaded a number of plaintiff's employees to work for their company. Defendant Carl D. Rideout admitted soliciting business for his company from at least one of plaintiff's customers while in plaintiff's employ and entertaining the customer at its expense. The so-called Bendix specifications were taken from the files by defendant Nancy Whitfield, turned over to Rideout for photostating, and returned to the files, all without Williams' knowledge  clearly a violation of the fundamental duty of loyalty owed by an employee to his employer. We must not lose sight of the inequitable character of defendants' conduct in making use of a process that is inimical to plaintiff's *372 interest. Cf. Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387 (E. & A. 1907).
An express agreement on the part of an employee to observe secrecy is not necessary to the establishment of a confidential relationship. Such an agreement may be implied from the circumstances of the case and the relation of the parties. See Golden Cruller & Doughnut Co. v. Manasher, 95 N.J. Eq. 537, 538 (Ch. 1923); Taylor Iron & Steel Co. v. Nichols, 73 N.J. Eq. 684, 688 (E. & A. 1908); Stone v. Grasselli Chemical Co., 65 N.J. Eq. 756, 759 (E. & A. 1903); Morrison v. Woodbury, 105 Kan. 617, 185 P. 735 (Sup. Ct. 1919); Rubner v. Gursky, 21 N.Y.S.2d 558 (Sup. Ct. 1940). It is not necessary that an employer put his employee on express notice that he regards his process as secret. 4 Restatement, Torts, § 757, p. 10. The Chancery Division, however, declared that "a confidential relationship cannot be imposed without notice that the information is imparted in confidence  it cannot arise without consent." We do not agree with so broad a statement.
The individual defendants, of course, denied they were ever told the process was secret. The trial judge was of the opinion that this testimony definitely refuted Williams' testimony on behalf of plaintiff. We must examine specific testimony not mentioned in the opinion below.
Defendant Carl Rideout denied Williams told him the process was secret. When asked to explain his part in the photostating of the Bendix specifications he said that this was done "for protection."
"Q. Do you mean by that that in case he [Williams] claimed that this was a secret process, which you knew it wasn't, you wanted some proof?
A. Yes, something to substantiate that it wasn't."
If Williams had never told him the process was secret, why should Rideout believe that Williams might claim that it was? The testimony seems to reveal a guilty knowledge of violating a confidential relationship through this extraction of records from the files without Williams' knowledge.
*373 Defendant Nancy Whitfield, who had typed the register which was used at the plant, said in answer to the question whether Williams had ever told her that when people went through the plant they were to be told it was confidential, that he instructed her to have them sign the register. Defendants' witness Mullins tried to give the impression that he was at liberty to disclose information about the Sun Dial process to anyone who might want it, but when asked for specific instances it appeared that he never actually gave any competitor information of any significance. Defendant James Rideout specifically admitted he knew that an effort was being made to keep knowledge of plaintiff's process from competitors  Williams instructed him on a couple of occasions not to take certain competitors through the plant. Defendant Robert Whitfield, who came to work for defendant two and one-half years ago, admitted it was his understanding even before he was employed that plaintiff was operating under a secret process  "somewhere along the line the idea arose that it would be good for some reason to speak of the process as if it were a secret to some people"  and he acted accordingly. And after coming to work for plaintiff, he wrote letters to other companies in which he described the Sun Dial process as secret. He dismissed this as mere "sales psychology" and "sales talk." Cf. Fairchild Engine & Airplane Co. v. Cox, 50 N.Y.S.2d 643 (Sup. Ct. 1944).
There is sufficient evidence to show that those taken through the process department were under escort from the time of their entry to the time of leaving.
There is one other bit of testimony to be considered  that of plaintiff's witness, Bagnole, who was working for defendant company when an inspection of its process was being held pursuant to court order in February 1953. * * * While the inspectors were present he had occasion to go to the cabinet where the ingredients were kept and the formula posted on the back of the cabinet door. * * * An essential ingredient was missing, as was * * * the formula itself. He inquired of Mullins and Rideout about *374 making up more solution and was told to wait. When the inspectors had gone he found the * * * [Ingredients] back in their place. This does not comport with an easy conscience.
On the entire case, we are of the opinion that a trade secret and a confidential relation were established and that there should be a reversal.
NOTES
[*] Asterisks other than those used in quoted material indicate text deleted because it relates to plaintiff's claimed secret process.