**MERCKLE GmbH, Plaintiff,**

v.

**JOHNSON & JOHNSON,
et al., Defendants.**

**Civil Action No. 94–56.**

United States District Court,
D. New Jersey.

April 15, 1997.

---

John M. Agnello, Jan Alan Brody, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, Kenneth J. Jurek, Roseanne J. Faraci, McDermott, Will & Emery, Chicago, IL, for Plaintiff.

Francis X. Dee, Carpenter, Bennett & Morrissey, Newark, NJ, Robert P. LoBue,

Jeffrey I.D. Lewis, Patterson, Belknap, Webb & Tyler, New York City, for Defendants.

### OPINION

WOLIN, District Judge.

Before the Court today is the motion brought by defendants Johnson & Johnson, Inc. ("J & J"), a New Jersey corporation, Johnson & Johnson International, a New Jersey corporation, Ortho Pharmaceutical Corp. ("Ortho"), a Delaware corporation, and R.W. Johnson Pharmaceutical Research Institute ("PRI"), an unincorporated division of Ortho (collectively, "defendants" or "Ortho") for summary judgment against plaintiff Merckle GmbH ("Merckle"), a German corporation. Merckle alleges that defendants misappropriated Merckle's trade secrets. Pursuant to Federal Rule of Civil Procedure 78, the Court decides this motion based on the written submissions of the parties. For the reasons expressed below, the Court finds that this case involves genuine issues of material fact that must be resolved at trial; the Court, therefore, will deny defendants' motion for summary judgment.

## I. BACKGROUND

### A. The Product, Parties and Patents

This case centers on the respective information used by Ortho and Merckle to manufacture a laboratory version of erythropoietin ("EPO"), a protein that is naturally produced by the healthy human body. EPO functions as a hormone that stimulates the formation of red blood cells. As with all proteins, EPO is constructed of amino acids that are strung together in a defined sequence based upon coding instructions found in the body's deoxyribonucleic acid ("DNA"). This string of amino acids forms the backbone of the protein to which carbohydrates and sialic acid attach through a process sometimes referred to as glycosylation. The pattern of substances that attach to the amino acids is important in determining how effective the EPO is in causing the body to make red blood cells. See Defs.' Statement of Undisputed Facts ("DSUF") ¶¶ A.3–A.5.

While human EPO is produced naturally in healthy humans, it also can be manufactured by splicing the DNA's EPO code sequence into a host cell's DNA. This genetically engineered EPO is known as recombinant human EPO, or "rHuEPO." Medicinal products containing rHuEPO may be used to treat anemia related to chronic renal failure, infections, immune deficiencies, and other ailments.

The commercial manufacturing of rHuEPO occurs from the use of Chinese hamster ovary ("CHO") host cells, which J & J and its licensor Amgen, Inc. ("Amgen") use, or baby hamster kidney ("BHK") host cells, which Merckle's licensor Elanex Pharmaceuticals, Inc. ("Elanex") uses. See id. ¶¶ A.6–A.7.

Once the genetic engineering process is completed (i.e., the string of amino acids is established and the glycosylation process occurs), the rHuEPO produced by the host cell is purified and formulated for human use. To formulate a medicinal product from the purified bulk rHuEPO it generally must be mixed with other items, "excipients," which perform various functions to make the product usable in humans. See id. ¶ A.11. The rHuEPO and the particular formulation through which it is prepared for human administration determine the biological activity of the medicinal product (e.g., its potency (number of red blood cells created per unit of the product), the speed with which it acts and is cleared from the body, and its side effects)

The full processes by which Merckle's rHuEPO is made cannot be discerned from the final product. See id. ¶ A.12. Those processes can only be ascertained and measured by extended in vivo and clinical studies. See id. Ortho avers that "any comparison between Merckle's and Ortho's rHuEPO would require a head-to-head clinical trial, which has never been completed." Defs.' Br. in Support of Motion for Summary Judgment ("Defs.' Br.") at 5; DSUF ¶ F.3.

Both Ortho and Merckle claim the right to manufacture and sell rHuEPO pursuant to licenses granted to them by Amgen and Elanex, respectively. Amgen and a related venture, Kirin–Amgen (collectively, "Amgen"), hold international rights to a series of EPO patents issued to Fu–Kuen Lin (the "Lin

Patents").[1] *See* DSUF ¶ B.1. The principal Lin Patent identifies the amino acid sequence of human EPO.[2] *See id.* In the United States, both Amgen and Ortho sell rHuEPO manufactured by Amgen. Outside the United States, Ortho separately manufactures and sells rHuEPO. *See id.* ¶ C.1–C.4. Through its affiliates, Ortho sells rHuEPO in Germany under the principal brand name Eprex.[3] *See id.* ¶ C.2.

Elanex, Merckle's licensor, acquired the rights to a European patent issued in the name of J. Powell and assigned to the University of Washington (the "Powell Patent"). *See* Pl.'s Br. in Opposition to Motion for Summary Judgment ("Pl.'s Br.") at 5. The license obtained by Elanex from the University of Washington relates to BHK host cells. *See id.* Merckle obtained a license from Elanex to use its bulk EPO and to develop and distribute a BHK cells-based rHuEPO in Germany, Switzerland and Austria. *See id.* at 6. The license agreement required Merckle to obtain bulk EPO from Opregen GmbH ("Opregen"), a German company designated by Elanex. *See id.* Merckle did not obtain any rights to Elanex's cell line—the amino acid "backbone" technology underlying the bulk EPO—nor does Merckle have specific knowledge of the technology used to prepare Elanex's BHK host cells. *See* DSUF ¶¶ C.10–C.18 (citing various written submissions of Merckle in *Amgen, Inc. v. Elanex Pharmaceuticals, Inc.,* 160 F.R.D. 134 (W.D.Wa.1994) ("*Amgen v. Elanex*"), a prior patent infringement litigation between Amgen and Elanex in which Merckle was sued for contributory infringement, but from which Merckle won dismissal).[4] Merckle, however, was involved in Germany in the work of Opregen and contends that it had its own plans regarding the development of pharmaceutical EPO, presumably with re-spect to the glycosylation process and the formulation of the rHuEPO, which did not require knowledge of the underlying host cells. *See* PSUF ¶¶ C.13–C.14. Merckle asserts it expended great resources in its attempts to develop the bulk EPO obtained from Opregen so as to obtain registration of a BHK cells-based rHuEPO. *See* Pl.'s Br. at 6–7. At about the same time as Merckle was finally ready to begin clinical studies, the European Lin Patent was published. *See id.* at 7.

## B. The History of Litigation

In 1990, Ortho learned that Merckle may have been conducting clinical trials involving rHuEPO. *See* DSUF ¶ E.2; PSUF ¶ E.2. In the United States, preclinical work and even clinical studies conducted in furtherance of registration are not acts of patent infringement. *See* 35 U.S.C. § 271(e)(1). German law, however, currently provides otherwise.

On October 2, 1990, Robert Minier of the J & J patent law department wrote a memo to Peter Tattle, a J & J executive directly involved in rHuEPO patent litigation. *See* DSUF ¶ E.3; Pl.'s Ex. 37 (copy of memo).[5] Minier's memo advised that "we are proceeding with preparing a cease and desist' letter to send to Merckle" and asked Tattle to develop evidence in the event Merckle failed to cease its activity. Pl.'s Ex. 37. Specifically, Minier requested: (1) documentation that Merckle was a licensee of Elanex; (2) further evidence of Merckle's activities and where in Germany they were taking place; (3) continuing surveillance to catch any filing by Merckle for registration to market rHuEPO, which "would be clear evidence of infringement;" and (4) *a sample of Merckle's product*

---

1. The Lin Patents are licensed by Kirin–Amgen to Ortho internationally, and by Amgen to Ortho in the United States.

2. Merckle disputes whether the Lin Patent disclosed the amino acid sequence. *See* Pl.'s Statement of Disputed and Undisputed Facts ("PSUF") ¶ B.1.

3. Merckle states that the name is Erypo. *See* PSUF ¶ C.2.

4. *Amgen v. Elanex* involved allegations that Elanex was infringing Amgen's rights under the United States Lin Patent. It had nothing to do with activities outside the United States and is generally irrelevant to the issues addressed in this litigation.

5. Merckle disputes defendants' version of this information. *See* PSUF ¶ E.3. The documents cited by defendants, however, support this statement as set forth here.

*so as to have the product independently analyzed. See id.* (emphasis added).

Minier's requests were passed along to J & J's German affiliates, and samples of Merckle's product were shipped to defendants in late October 1990. *See* DSUF ¶ 4 E.6–E.13. That shipment was lost in transit and, as defendants assert, was never recovered. *See id.* ¶ E.13.[6] On March 11, 1991, a sample of Merckle rHuEPO arrived at Ortho's PRI lab, a lab which analyzes pharmaceutical products believed to infringe Ortho patents. See *id.* ¶ E.15–E.16; PSUF ¶ E.16. The record does not disclose the source of the Merckle rHuEPO. After initial tests were performed on the Merckle sample, Ortho filed suit for patent infringement against Merckle on May 16, 1991, in Germany. *See* DSUF ¶¶ E.18–E.19; PSUF ¶ E.18.

In February 1992, PRI issued a report describing the Merckle rHuEPO as "indistinguishable" from and "equivalent to" the rHuEPO in HEMAX, the commercially available Elanex rHuEPO that PRI had previously analyzed. *See* Pl.'s Ex. 11 at 1; Pl.'s Ex. 83. On February 17, 1992, an Ortho executive distributed the PRI report to various foreign affiliates with a cover memo, which emphasized the equivalence of Merckle's rHuEPO and HEMAX and identified certain disadvantages of the Merckle/HEMAX rHuEPO when compared to Eprex, Ortho's rHuEPO. *See* Pl.'s Ex. 13. The cover memo, however, indicated that the formulations of the Merckle product and HEMAX differed. *See id.; see also* PSUF ¶ E.22 (stating that the only similarity between HEMAX and Merckle EPO was that both derived from a BHK cell). The memo also advised: "Copies of this report are not to be shown or distributed to others outside the company, without written permission from

PRI, though the findings are certainly available for you to use." *See* Pl.'s Ex. 13.

Merckle contends that this memo evidences defendants' distribution of the PRI report for competitive purposes. *See* PSUF ¶ E.20. Ortho, however, avers that there is no evidence that the PRI report was used for any commercial purpose: "Given the serious questions raised by the PRI report and [the cover memo] as to the quality of Merckle's product, there is no plausible basis for even surmising that J & J would have wanted to use the information to 'improve' its own successful product." Defs.' Br. at 17. Indeed, the defendants insist that they did not learn anything from the PRI report on the Merckle product that they did not already know from the prior analysis of HEMAX. *See id.;* DSUF ¶ E.28.

On May 26, 1992, the German District Court ruled that Merckle's rHuEPO infringed the Lin Patent.[7] *See* DSUF ¶ E.29.

In September 1992, an injunction issued forbidding Merckle from making, using or selling rHuEPO in violation of the Lin Patent. *See id.* ¶ E.30; Defs' Ex. 41 at 3. The injunction was later modified to allow Merckle to continue clinical trials that had begun before the injunction issued. *See* Pl.'s Ex. 74 at 2.

On September 10, 1992, an Ortho executive distributed a memo to Ortho's German affiliates informing them of the injunction and requesting any evidence of continued manufacturing or selling of rHuEPO by Merckle. *See* Pl.'s Ex. 40. The memo advised that any evidence should be sent to Richard Grochala, Minier's successor at the J & J patent law department. *See id.*

Thereafter, in response to the memo, Grochala received Merckle clinical trial protocol EPO–05. *See* DSUF ¶ E.35. The record

---

6. Merckle disputes defendants' statement in DSUF ¶ E.13. *See* PSUF ¶ E.13. In support of its dispute, Merckle baldly cites to their exhibit 59 without a page reference. In the absence of a page reference, the Court reviewed Merckle's exhibit 59 in its entirety. Presumably, Merckle disputes the statement that the shipment was never recovered. Indeed, defendants' supplemental answer to interrogatory 4 indicates that the shipment was recovered. *See* Pl.'s Ex. 59 at 3.

7. After Merckle was decreed an infringer in Germany and was sued for contributory infringement by Amgen in *Amgen v. Elanex,* Opregen discontinued manufacturing EPO for Merckle on behalf of Elanex, and Elanex repossessed its cell line from Opregen. *See* DSUF ¶ C.19; PSUF ¶ C.19.

does not disclose the source of the protocol. Protocol EPO–05 demonstrated that Merckle may have been enrolling new patients in clinical studies using infringing Merckle EPO. *See id.* ¶ E.36; PSUF ¶ E.36; Pl.'s Ex. 10 (copy of protocol EPO–05). Ortho submitted the evidence to the German court, and, on January 26, 1994, the German court found Merckle in contempt of the injunction and levied a fine of 100,000 Deutsche Marks (approximately $60,000). *See* DSUF ¶ E.37; Defs' Ex. 75.

Around the same time as the injunction issued, Merckle appealed the German court's initial ruling of infringement. Ortho contends that, on appeal, Merckle argued that its rHuEPO, based on the Powell Patent, consisted of a different amino acid sequence (*i.e.*, a different "backbone") than that of Ortho's rHuEPO, based on the Lin Patent. *See* DSUF ¶ E.41 (citing Merckle's appeal briefs to the German appellate court). Merckle disputes this fact. *See* PSUF ¶ E.41. Ortho contends that it believed Merckle was deceiving the appellate court.

For this reason, Ortho sought to obtain additional samples of Merckle's rHuEPO to determine the validity of Merckle's claim. *See* Defs.' Br. at 19. In November 1992, Ortho's German patent counsel, Ulrich Stolberg, forwarded to Grochala a Merckle appeal brief with the following advice: "The non-infringement argument of Merckle will have to be studied rather carefully since it will of course be the subject of the further appeal proceedings.... If at all possible *sufficient amounts of the Merckle EPO should be secured* and sequenced in order to find out whether they are really using a different sequence." Defs.' Ex. 78 (emphasis added).[8] On at least one occasion thereafter, Grochala confirmed to an Ortho affiliate the need to acquire samples of Merckle's product. *See* Pl.'s Ex. 64 (letter from Grochala to Swiss affiliate).

In response, Grochala received two shipments of rHuEPO totaling approximately 85 vials. *See* DSUF ¶ E.46. As with the prior sample sent to PRI and protocol EPO–05, the source of the 85 vials is not disclosed in the record. Grochala sent all 85 vials to SRI International ("SRI"), an *independent* testing lab in California, for analysis. *See id.* ¶ E.47. SRI issued a report on July 22, 1993, and Ortho submitted the SRI report to the German appellate court on August 11, 1993. *See* DSUF ¶ E.49; Pl.'s Ex. 49 (copy of the SRI report). The SRI report concluded that "the amino acid sequence of Merckle EPO is identical to that of EPREX." Pl.'s Ex. 8 at ii. The report, however, did not discuss the glycosylation pattern. *See id.*; PSUF ¶ E.48. Nevertheless, Merckle's expert, Dr. Sytkowski, testifies to various oddities in the SRI report and generally postulates that the SRI analysis was conducted for competitive purposes. *See* PSUF ¶ E.48; Sytkowski Decl. ¶¶ 16, 20–24.

Ortho claims that in anticipation of Merckle attacks on SRI's methodology, Ortho commissioned SRI to conduct a second analysis, using the remaining supply of the 85 vials of the Merckle rHuEPO. *See id.* ¶ E.51. SRI's supplemental report, issued on February 1, 1994, generally confirmed the prior report. *See* Pl.'s Ex. 9; Pl.'s Ex. 50 (copy of the supplemental SRI report). Ortho submitted the supplemental report to the German appellate court.

In the German appellate court, Merckle argued that the contents of the SRI reports and protocol EPO–05 were improperly obtained Merckle trade secrets and should be excluded from evidence. *See* DSUF ¶ E.54. The German court refused to exclude the evidence, finding Merckle's arguments irrelevant. *See id.* ¶ E.55; Hausdorf Decl. ¶ 36. On April 28, 1994, the German appellate court found that Merckle's amino acid sequence was identical to that of Ortho's Eprex and upheld the infringement finding.[9] *See* DSUF ¶ E.56.

As the German litigation proceeded, Merckle filed this action on January 7, 1993, arguing, as it did in the German courts, that

---

8. The Court was unable to review all of Stolberg's memo because portions of the memo were redacted.

9. The judgment of the German appellate court is now on review before the Supreme Court of Germany; oral argument is scheduled for April 17, 1997.

the analyses of Merckle's rHuEPO commissioned by Ortho and the procurement of protocol EPO–05 constitute a misappropriation of Merckle's trade secrets. Merckle also alleges that Ortho induced breaches of contract in obtaining the samples of Merckle rHuEPO and protocol EPO–05.

## C. Secrecy of Merckle's Proprietary Information

One of Ortho's arguments in support of its summary judgment motion is that no jury could find that Ortho misappropriated Merckle's alleged trade secrets because, as evidenced by the public disclosure of Merckle's purported trade secrets and Merckle's alleged failure to protect adequately the information at issue, the information does not constitute trade secrets. The following facts are relevant to a determination as to whether the information relating to Merckle's rHuEPO was sufficiently secret as to warrant trade secret protection.

### 1. Publication of Product Specifications

Ortho claims that Merckle's rHuEPO was publicly disclosed through various publications. Ortho identifies several publicly available articles, which Ortho maintains examine and analyze the structure, formulation and effects of Elanex's or Merckle's rHuEPO. *See* DSUF ¶¶ D.16–D.21 (citing articles included as defendants' exhibits 57–67). Merckle's expert, Dr. Sytkowski, the co-author of several of these articles, however, states that the articles do not disclose any analyses of EPO and do not disclose glycosylation and carbohydrate structure of Merckle's EPO. *See* PSUF ¶¶ D.17–D.21; Sytkowski Decl. ¶ 28.

Yet, a separate article, entitled "Structures of Sialylated Oligosaccharides of human erythropoietin expressed in recombinant BHK–21 cells," appears to set out the carbohydrate pattern of Merckle's rHuEPO. *See* DSUF ¶ D.22; Defs.' Ex. 3. The article was co-authored by, among others, Manfred Nimtz, Wolfgang Martin, the leader of Merckle's rHuEPO project, and Jan Augustin, then a managing director and chief executive of Merckle. *See id.* ¶ D.23; Pl.'s Ex.

3 (the "Nimtz Article"). The Nimtz Article explicitly states that the substance analyzed is .Elanex EPO manufactured from BHK cells according to Powell and pharmaceutically developed by Merckle. *See* Pl.'s Ex. 3 at M137. The Nimtz Article discusses the glycosylation characteristics of the Merckle product and concludes that "[t]he carbohydrate structures of recombinant human erythropoietin produced from BHK21 cells have been determined." *See id.* at M150.

Merckle argues that the rHuEPO publicized in the Nimtz Article differed from the rHuEPO used in its clinical trials because the respective rHuEPOs were produced in different batches. *See* PSUF ¶ D.26; DSUF ¶ D.26. Ortho, however, cites to statements made by Merckle executives who acknowledge variations in batches, and who indicate that Merckle had no set standards for measuring batch variations. *See* DSUF D.27–D.28 (citing to depositions). Merckle nevertheless opines that the variations between the Nimtz Article rHuEPO and the clinical study rHuEPO are significant enough to constitute different products, while the variations between batches used for clinical studies fall within a scientifically acceptable range of deviation. *See* PSUF ¶ D.27–D.28.

### 2. Formulation Published on Shipping Boxes

Ortho argues that Merckle's formulation cannot be deemed secret because it was publicly revealed. Indeed, Merckle distributed its product for clinical studies in hospitals and clinics with the rHuEPO formulation printed on the outside of the boxes containing the ampules of product. *See* DSUF ¶ D.6. Merckle rHuEPO was stored in the boxes, which Ortho contends were available for all hospital and clinic personnel to see, whether or not such personnel were involved in the study. *See id.* ¶ D.7. Ortho states that Merckle never requested that the clinical sites keep Merckle rHuEPO, or the boxes in which it was shipped and stored, out of public view. *See id.* ¶ D.8.

Merckle contests that its formulation was publicly disclosed. Merckle maintains that it labeled its packaging in accordance with applicable law and directives and that the only

persons who could handle the drugs were subject to confidentiality restrictions. *See* PSUF ¶¶ D.6, D.8. Moreover, Merckle avers that its product was neither stored in public places nor publicly displayed. *See id.* ¶¶ D.6–D.8 Finally, Merckle argues that the German Drug Law prohibited any distribution of Merckle's products to any company or person not authorized by Merckle. *See id.* ¶ D.8.

### 3. Public Availability of Identical Product

Ortho contends that no trade secrets exist here because Merckle's product is identical to publicly available products. The record indicates that Elanex's EPO is sold in India and was previously sold in Argentina from 1989–1992. *See* DSUF ¶ D.10. Ortho also states that HEMAX is sold in South Africa, although Merckle disputes this. *See id.;* PSUF ¶ D.10. The HEMAX package insert discloses the formulation content, and the other particulars of that product. *See* DSUF ¶ D.12. By October 11, 1990, Ortho's PRI lab had performed an in-house analysis of HEMAX, and, in September 1991, PRI issued a report on HEMAX. *See id.* ¶ D.11. PRI's February 10, 1992 report of its analysis of Merckle's product indicates that "[t]he rHuEPO contained in the Merckle product is equivalent to that contained in HEMAX." Pl.'s Ex. 11 at 1.

Merckle claims that the report does not conclude that its rHuEPO is the same as HEMAX. See PSUF ¶ D.14. Merckle also asserts through its expert, Dr. Sytkowski, that its rHuEPO is different than the HEMAX analyzed by PRI. *See id.* ¶ D.15. Indeed, a J & J memorandum explicitly states that "the formulations of the product[s] differ." Pl.'s Ex. 13.

### 4. Confidentiality Agreements

Ortho avers that Merckle failed to adequately protect the confidentiality of its product. Ortho states that Merckle freely distributed its rHuEPO to nearly 100 third parties, including clinical sites, blood banks, testing laboratories and the South American and South African licensees of Elanex, without any secrecy agreements. *See* DSUF ¶¶ D.1, D.2 and D.4; Defs.' Ex. 52. At sites where confidentiality agreements were obtained, typically only one person per site signed an agreement; neither the doctors nor nurses actually administering the Merckle product signed any confidentiality agreement. *See* DSUF ¶ D.3.

Merckle concedes that it sent samples of its rHuEPO to a number of clinics for studies and trials. *See* PSUF ¶ D.3. Merckle contends, however, that confidentiality agreements were not required from all individuals because all studies and trials were conducted under conditions of confidentiality (*e.g.,* via confidentiality agreements signed by the lead clinician or the confidentiality provisions in the relevant trial protocol) and all individuals involved in the studies and trials were subject to confidentiality requirements under European Good Clinical Practice ("GCP") guidelines. *See id.* ¶ D.4; Pl.'s Ex. 21 (copy of the European GCP guidelines).

### 5. Clinical Trial Protocols

Ortho insists that Merckle never treated its clinical trial protocols as secret and, thus, they do not constitute trade secrets. As Ortho points out, Merckle does not know how many copies of its protocol it distributed, cannot identify who received the protocol among those involved in the Merckle clinical studies and took no steps to limit photocopying of the protocol. *See* DSUF ¶¶ D.30–D.31. As such, Merckle's head of clinical studies agreed that Merckle would have no way of determining how defendants obtained a copy of the protocol. *See id.* ¶ D.32.

Merckle argues that anyone who received a trial protocol was subject to confidentiality restrictions and that lead investigators were given extra copies of the protocol only after signing a secrecy agreement. *See* PSUF ¶ D.30–D.31. Merckle, however, concedes that someone could have photocopied a trial protocol without Merckle's knowledge or consent. *See id.* To wit, on one occasion prior to May 1990 J & J received a Merckle program from another German rHuEPO competitor. *See* DSUF ¶ D.36; PSUF ¶ D.36. Ortho insists that "[t]here is no information of substance in the other protocols obtained by Ortho that was not already in the Merckle

document provided to J & J by [the competitor]." Defs.' Br. at 14. Merckle disagrees claiming that the protocol EPO–05 is significantly more detailed. *See* PSUF ¶ D.36.

## D. Evidence of Competitive Use

Ortho maintains that the record is devoid of any evidence of competitive use of Merckle's alleged trade secrets. Ortho highlights that Merckle has deposed ten present and former employees of defendants or their affiliates and contends that these witnesses "would necessarily have been knowledgeable about any commercial use made by defendants of Merckle's alleged trade secrets." Defs.' Br. at 25. Ortho also insists that it had no reason to misappropriate Merckle's alleged trade secrets because, *inter alia,* the PRI report indicated that Merckle's product was inferior and the Merckle product derived from BHK cells, which are fundamentally different from the CHO cells used by Ortho. *See id.* at 25–26.

Merckle strongly refutes Ortho's claim that no evidence of competitive use exists in the record and maintains that a reasonable jury could infer that Ortho used Merckle's trade secrets to the detriment of Merckle. Merckle first contends that Ortho's use of the alleged trade secrets in the patent infringement litigation in Germany constitutes detrimental use. Ortho counters this allegation by claiming that its use of Merckle's alleged trade secrets in the patent litigation was privileged.

Merckle also posits that Ortho reformulated its product to be more like Merckle's after misappropriating Merckle's product. *See* PSUF ¶ F.2; Pl.'s Br. at 25–26; *see generally* Sewing Decl. Indeed, it is undisputed that Ortho altered one aspect of the formulation of its rHuEPO after the date on which it obtained samples of Merckle's rHuEPO. *See* Defs.' Reply Br. at 6. Ortho, however, insists that the change was rooted in publicly available knowledge and that it was the result of a well-documented, two year long laboratory study that presumably predated the receipt of the Merckle product information. *See id.* at 6–8; *see generally* Corbo Decl.

Finally, Merckle opines that Ortho's commission and circulation of the PRI and SRI reports give rise to an inference of detrimental use by Ortho. *See* Pl.'s Br. at 25–26.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgement has the burden of demonstrating that there is no genuine issue as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In making this determination, the Court must draw all reasonable inferences in favor of the non-movant. *See National State Bank v. Federal Reserve Bank of New York,* 979 F.2d 1579, 1581 (3d Cir.1992).

If the moving party has sustained its burden, the burden shifts to the non-moving party to demonstrate to the Court that sufficient evidence exists from which a jury might return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3rd Cir.1987) (Becker, J., concurring). The non-movant may not "rest upon mere allegations, general denials," or "vague statements." *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations in [a nonmovant's] memorandum and pleadings are insufficient to repel summary judgment"); see Fed.R.Civ.P. 56(e). If the non-movant's evidence is merely "colorable" or "not significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. The summary judgment procedure enables a party "who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process

of litigation continues." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

The Court's function at the summary judgment stage of litigation is to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11. Absent evidence sufficient to permit a jury to return a verdict for the non-moving party, there is no issue for trial, and summary judgment must be granted. *See id.*

## B. Misappropriation of Trade Secrets

"A trade secret claim in the federal courts is governed not by federal common law but by state law." *Rohm and Haas Co. v. Adco Chem. Co.,* 689 F.2d 424, 429 (3d Cir.1982). The parties have agreed, for purposes of this motion, that New Jersey law applies. *See* Defs.' Br. at 28 n. 4.

New Jersey law establishes five basic elements of a claim of trade secret misappropriation: "(1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to the employee; (3) disclosed by the employee in breach of that confidence; (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff." *Rohm and Haas,* 689 F.2d at 429–30 (citations omitted). New Jersey law also requires "that the plaintiff show that he took precautions to maintain the secrecy of the trade secret." *Id.* (citing *Sun Dial Corp. v. Rideout,* 16 N.J. 252, 260, 108 A.2d 442 (1954) ("*Sun Dial*")). Indeed, adequate precautions to protect the secrecy of information are indispensable to a plaintiff's claim that a trade secret exists and is entitled to protec-

tion. See 1 Roger Milgrim, *Trade Secrets* § 1.03 at 1–86 (1994) ("*Trade* Secrets"). Merckle will bear the burden of proving these elements at trial. *See Schmidinger v. Welsh,* 243 F.Supp. 852, 864 (D.N.J.1965), *aff'd in relevant part,* 383 F.2d 455 (3d Cir. 1967), *cert. denied,* 390 U.S. 946, 88 S.Ct. 1031, 1040, 19 L.Ed.2d 1134 (1968).

Ortho argues that summary judgment is appropriate on Merckle's misappropriation of trade secrets claim because: (1) Merckle's alleged trade secrets were not secret; (2) Merckle failed to adequately protect its alleged trade secrets; and (3) Ortho's use of the alleged trade secrets was privileged and, therefore, not actionable.[10]

### i. Existence of Trade Secret; Adequacy of Protection

■ In any trade secret case, the Court must first determine whether there exists, in fact, a trade secret. *See Continental Data Sys., Inc. v. Exxon Corp.,* 638 F.Supp. 432, 442 (E.D.Pa.1986); *Sun Dial Corp. v. Rideout,* 29 N.J.Super. 361, 365, 102 A.2d 90 (App.Div.) ("*Sun Dial Corp.*"), *aff'd,* 16 N.J. 252, 108 A.2d 442 (1954). According to the *Restatement of Torts* section 757, comment b:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound [or] a process of manufacturing, treating or preserving materials . . . .[11]

*See also Sun Dial,* 16 N.J. at 257, 108 A.2d 442. Neither party contests that the type of

---

**10.** Ortho also argued in its brief that Merckle had no right to assert trade secrets with respect to the bulk rHuEPO because all rights were retained by Merckle's licensor, Elanex. *See* Defs.' Br. at 39–40. Merckle briefly countered this argument, *see* Pl.'s Br. at 36–37, and Ortho abandoned the argument on reply. The Court does not view Ortho's argument as a legitimate basis on which to grant summary judgment.

**11.** Merckle points out that New Jersey now follows the *Restatement (Third) of Unfair Competition* rather than the *Restatement of Torts. See* Pl.'s Br. at 16 n. 7 (citing *Platinum Management, Inc. v. Dahms,* 285 N.J.Super. 274, 296, 666 A.2d

1028 (Law Div.1995)). While *Platinum Management, Inc.* merely cites to a definition of "trade secret" found in a tentative draft of the *Restatement (Third) of Unfair Competition,* the authors of that Restatement make clear that it was intended to replace certain parts of the *Restatement of Torts. See, e.g., Restatement (Third) of Unfair Competition* § 40, cmt. b (1995) (discussing differences in the "prior Restatement of this topic"). Indeed, in its reply brief, Ortho does not appear to contest that the *Restatement (Third) of Unfair Competition* is, at least, relevant, if not instructive. *See, e.g.,* Defs.' Reply Br. at 4–5.

information at issue here (i.e., the process for making rHuEPO) is worthy of trade secret protection.

The subject matter of a particular trade secret, however, must be secret. *See Restatement of* Torts § 757, cmt. b (1939). With respect to secrecy, the *Restatement of Torts* instructs:

> Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved it its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret.

> Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information.

*Id.* "Secrecy is essentially a question of fact," 1 *Trade Secrets* § 1.03 at 1–87 to 1–88, and the parties here vigorously dispute whether the process by which Merckle produced its rHuEPO is secret.

█ After a thorough review of the parties' voluminous written submissions, the Court is unable to conclude at this time that Merckle's alleged trade secrets were published to the extent that secrecy was destroyed. Among the issues of fact to be resolved at trial that bear upon the secrecy of Merckle's purported trade secrets include: (1) whether Merckle's packaging of its rHuEPO, and the handling of such packaging, disclosed the formulation of Merckle's rHuEPO to the public; (2) whether a product (*i.e.*, Elanex's EPO) that was identical to Merckle's rHuEPO was publicly available; and (3) whether Merckle's clinical rHuEPO was discussed in publicly available articles and the extent to which the secrecy of Merckle's rHuEPO was disclosed by the publication of such articles.

The resolution of these questions will rest largely upon the credibility of witnesses, and, therefore, the Court is unable to grant summary judgment as to whether Merckle's alleged trade secrets were public knowledge.

█ Ortho also claims that Merckle failed to adequately protect its alleged trade secrets; consequently, Ortho insists that Merckle cannot assert a claim of misappropriation and summary judgment is justified.

Faced with this claim in the context of a summary judgment motion, the Court must review the record in the light most favorable to Merckle, the non-movant, and determine whether a reasonable jury could conclude that Merckle took reasonable measures to protect the secrecy of its information. *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *Shamrock Tech., Inc. v. Medical Sterilization, Inc.*, 808 F.Supp. 932, 937 (E.D.N.Y. 1992) (applying New Jersey substantive law), *aff'd*, 6 F.3d 788 (Fed.Cir.1993); *Sun Dial Corp.*, 29 N.J.Super. at 371, 102 A.2d 90 ("We conclude, therefore, that plaintiff took reasonable measures to maintain the secrecy of its process, and that the necessary element of secrecy exists in this case."). Notably, "[t]he secrecy in which a purported trade secret is shrouded need not be absolute." *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410, 422 (E.D.Pa.1980) (Becker, J.) (citation omitted); *see also Sun Dial Corp.*, 29 N.J.Super. at 368, 102 A.2d 90 ("Absolute secrecy is not required, but rather that qualified secrecy which arises from mutual understanding and is required alike by good faith and good morals.").

The Court concludes that the present record evinces genuine issues of material fact that preclude granting summary judgment in favor of Ortho as to the precautions taken by Merckle to protect the secrecy of its alleged trade secrets. As exhibited above, the factual record in this case is complex and heatedly contested; this is particularly true with respect to the parties' assertions as to the precautions, or lack thereof, taken by Merckle to keep its proprietary information out of the public domain. *See, e.g., supra* §§ I.C.2, 4–5; *see generally* DSUF and PSUF.

For example, while Ortho avers that Merckle's failure to obtain confidentiality agreements from all hospital and clinical personnel who administered product trials eradicates Merckle's claim of secrecy, Merckle argues otherwise, claiming that confidentiality protections were in place via (1) confidentiality agreements and protocols signed by lead clinicians, (2) the European GCP guidelines and (3) German drug laws. Drawing all inferences in favor of Merckle, the Court concludes that a reasonable jury could conclude that these measures adequately protected the confidentiality of Merckle's rHuE-PO and trial protocols. *See Shamrock Tech.*, 808 F.Supp. at 937–38 ("Nor is the failure of [the trade secret owner] to require secrecy or confidentiality agreements to maintenance people and visitors a failure to take reasonable precautions to maintain secrecy."); *Continental Data Sys., Inc.*, 638 F.Supp. at 443 (citing company rules requiring assurances of confidential treatment from prospective purchasers as evidence of "significant precautions" taken by the trade secret owner); *Anaconda Co.*, 485 F.Supp. at 422 (finding secrecy precautions reasonable, albeit not absolute, where employees were merely aware of the confidential nature of the machinery at issue).

The Court notes that no one factor is dispositive of whether Merckle took reasonable precautions to protect its purported trade secrets. *See, e.g., Geritrex Corp. v. Dermarite Indus., LLC,* 910 F.Supp. 955, 962 (S.D.N.Y.1996) (finding plaintiff's efforts to secure its facility indeterminate of secrecy in light of the "overwhelming indications" that plaintiff otherwise failed to protect the confidentiality of its product information). The test is one of reasonable, not absolute, precautions, and the jury will be charged with considering the entire record to determine whether Merckle's alleged trade secrets were, in fact, secret.

In the Court's view, the record certainly indicates something less than absolute secrecy. As evidenced by the parties' conflicting factual accounts, however, the resolution of several of the above issues will hinge on factual issues properly resolved by the factfinder. Therefore, based on the record be-

fore it, the Court cannot conclude that there exist no genuine issues of fact with respect to the secrecy of Merckle's rHuEPO.

### 2. Disclosure and Use of Alleged Trade Secrets by Ortho

■ As set forth above, the fifth required element in a claim of trade secret misappropriation is use of the trade secret by the competitor to the detriment of the plaintiff. *See Rohm and Haas,* 689 F.2d at 430. The parties have cited, and the Court has found, scant case law discussing what constitutes detrimental use; in the vast majority of cases, the defendant's use of the trade secret is obvious. *See, e.g., id.* at 431 ("There is no dispute that defendants used the [trade secret] to compete against plaintiff by putting on the market two products touted as duplicates of plaintiff's products."). The use primarily at issue here—Ortho's use of the information in connection with the commercial litigation in Germany—is unique and cannot easily be measured against available precedent.

Ortho maintains that it used Merckle's purported trade secrets only for the purpose of litigating its patent infringement claims against Merckle. Ortho urges the Court to hold that "[t]he use of trade secrets for evidentiary purposes in litigation is not a detrimental use' that is actionable at the suit of the person against whom the secrets are used." Defs.' Br. at 28. Ortho argues that this holding is justified "because public policy encourages the exposure of possible wrongdoing." Id. at 29 (citing *McGrane v. Reader's Digest Ass'n, Inc.,* 822 F.Supp. 1044 (S.D.N.Y.1993) and *Lachman v. Sperry–Sun Well Surveying Co.,* 457 F.2d 850 (10th Cir. 1972)); *see also* Defs.' Reply Br. at 3 ("Patent infringement and willful contempt of court constitute wrongdoing of sufficient public concern as to implicate the privilege.").

Ortho roots its claim of privilege in the discussion of privileged use and disclosure found in the *Restatement of Torts* section 757, comment d:

A privilege to disclose or use another's trade secret may arise from the other's consent or from other conduct on his part by which he is estopped from complaining.

A privilege to disclose may also be given by the law, independently of the other's consent, in order to promote some public interest.

*See* Defs.' Br. at 28; *see also System Operations, Inc. v. Scientific Games Dev. Corp.,* 425 F.Supp. 130, 136 (D.N.J.1977) (stating in dictum that "disclosure of trade secret information may itself be privileged").

Ortho also claims that the concept of privilege is recognized in the *Restatement (Third) of Unfair Competition* section 40, comment c. *See* Defs.' Reply Br. at 2. Section 40 discusses privileged disclosure:

> The unauthorized disclosure of a trade secret ordinarily occurs as part of an attempt to exploit the commercial value of the secret through use in competition with the trade secret owner or through a sale of the information to other potential users.... If the trade secret is disclosed primarily for the purpose of causing harm to the trade secret owner, a court may properly conclude that the actor is subject to liability despite an absence of commercial exploitation.... In other circumstances, however, the disclosure of another's trade secret for purposes other than commercial exploitation may implicate. another significant public interest.... The existence of a privilege to disclose another's trade secret depends upon the circumstances of the particular case, including the nature of the information, the purpose of the disclosure, and the means by which the actor acquired the information. A privilege is likely to be recognized, for example, in connection with the disclosure of information that is relevant to public health or safety, or to the commission of a crime or tort, or to other matters of substantial public concern.

*Restatement (Third) of Unfair Competition* § 40, cmt. c (1995). The Reporters' Notes to Section 40 indicate that "[t]he policies underlying the privilege are similar to those supporting the numerous state and federal 'whistleblower' statutes that prohibit retaliatory personnel actions by employers against employees who disclose violations to public officials." *Id.* § 40, Reporters' Notes, cmt. c.

With respect to Ortho's disclosure of Merckle's alleged trade secrets, this case is not a whistleblower case. This case does not involve an employee disclosing his employer's trade secrets to a government entity in the course of revealing evidence of wrongdoing to protect some public interest, such as the public's health or safety. Nor does this case directly involve a third party disclosing proprietary information to a trade secret owner's competitor in order to expose a wrong. *See Lachman,* 457 F.2d at 850 (refusing to hold liable an oil well surveyor who, despite a nondisclosure contract, disclosed to an adjoining landowner that the surveyed well encroached on the landowner's property). Indeed, the record could be construed to indicate that Ortho disclosed Merckle's purported trade secrets to the German courts to protect its own commercial interests; while Ortho claims that it disclosed Merckle's information only to evidence the patent infringement—a tort, Ortho did not disclose Merckle's alleged trade secret to reveal a harm rooted in the public interest. While the public certainly has some interest in protecting valid patents, the public may, in fact, have an even greater interest in advancing the development of new and better drugs.[12] Consequently, the Court concludes that Ortho's disclosure of the information did not further a substantial public interest that would support a privilege in this case. Because the particular circumstances of this case do not support a finding that Ortho's disclosure of Merckle's alleged trade secrets was privileged, Ortho's reliance on a privilege theory is unavailing.[13]

---

**12.** This may well be the reason that United States law does not define patent infringement to include certain clinical trials or studies. *See* 35 U.S.C. § 271(e)(1).

**13.** Moreover, the record gives rise to an inference that Ortho wrongfully obtained Merckle's information. See Defs.' Br. at 2 ("defendants concede that the materials were obtained without Merckle's consent"); *Restatement (Third) of*

*Unfair Competition* § 40(a) (1995) (providing that a defendant is liable for the appropriation of plaintiff's trade secrets if the defendant acquired the trade secrets "by means that are improper"). The Court notes that defendants have conceded only that they obtained the alleged trade secrets without Merckle's consent; defendants have not conceded that they improperly obtained the alleged trade secrets. *See* Defs.' Reply Br. at 1. In

Ortho nevertheless argues that the concept of privilege encompasses Ortho's *use* of Merckle's information in the context of commercial litigation. With respect to the unauthorized use of trade secrets, the Third Restatement states:

> There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret. . . . As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' under this Section. . . . The nature of the unauthorized use, however, is relevant in determining appropriate relief.

*Restatement (Third) of Unfair Competition* § 40, cmt. c (1995). Notably, the Third Restatement does not discuss the concept of privilege with respect to unauthorized use; instead, the Third Restatement identifies the nature of the unauthorized use as a remedial issue. *See id.* The Court, therefore, questions whether under the Third Restatement any use can be privileged. *But cf. Stork–Werkspoor Diesel V.V. v. Koek*, 534 So.2d 983 (La.App.1988) (dissolving injunction that prohibited former employee of defendant from advising plaintiff in product liability action about the design and manufacturing of defendant's product). Accordingly, the Court refuses to find Ortho's use of Merckle's purported trade secrets privileged.[14] Ortho indisputably "used" Merckle's information. To the extent such use is found to be detrimental to Merckle, the nature of Ortho's use is an issue rightly argued with respect to damages to Merckle.

■ In the absence of a litigation privilege, a reasonable jury could conclude that Ortho disclosed and used Merckle's purported trade secrets to the detriment of Merckle. Indeed, after the German court rendered its ruling of infringement, Merckle was restrained from conducting further product trials and its supply of bulk EPO from Opregen was discontinued. Wounding a competitor with the sword of commercial litigation, even where the "victim" was infringing upon the "attacker's" patents, supports at least an inquiry as to the existence of detrimental use; commercial advantage can be had by using information to further one's own sales efforts or to cripple a competitor's.[15]

■ Merckle also asserts that summary judgment should be denied because the record reveals additional evidence of detrimental use by Ortho. First, Merckle contends that Ortho altered the formulation of its rHuEPO after obtaining samples of the Merckle rHuEPO; specifically, Merckle alleges that Ortho altered the composition of the buffer in its rHuEPO.[16]

Although Ortho did not address this fact in its initial brief, Ortho conceded this fact on reply. *See* Defs.' Reply Br. at 6 (acknowledging substitution of phosphate buffer for the original citrate buffer in its rHuEPO after the date of receipt of Merckle's rHuEPO). In its reply brief, Ortho vigorously

---

fact, how Ortho obtained the information (*i.e.*, the source of the alleged trade secrets) has been an issue in this case from the beginning. Nevertheless, the Court cannot conclude that Ortho did not improperly obtain Merckle's purported trade secrets. Notably, if Merckle successfully shows that its information was secret, the inference that Ortho improperly obtained the information may be enhanced, as will be the inference that Ortho should have known that the information was a trade secret. Ortho's argument that no such inferences exist at this time is rejected. *See* Defs.' Reply Br. at 10–13.

14. The Court emphasizes that the conclusion that no privilege exists here is based on the particular circumstances of this case. The Court leaves unresolved the question of whether any use can be privileged under the Third Restatement. Indeed, without thoroughly pondering the issue, the Court believes that where a public interest group (or other entity that cannot be viewed as having a competitive agenda) uses trade secrets in litigation, a privilege ought to be recognized.

15. In the United States, the discovery rules provide protection for trade secrets in the litigation context. *See* Fed.R.Civ.P. 26(c). Were the Court to establish a privilege for the use of trade secrets in the context of the commercial litigation here, the Court would imprudently encourage vigilanteism with respect to obtaining trade secrets without the significant protections that exist under the discovery rules (*e.g.*, protective orders).

16. Without delving into a thorough discussion, a buffer is generally included in a pharmaceutical to regulate changes in the pharmaceutical's pH level. The pH level of a pharmaceutical affects the amount of discomfort a patient experiences upon injection of the pharmaceutical.

argues that the change to its formulation was based on publicly available information and resulted from two years of well-documented laboratory research. *See id.* at 6–8. Ortho's argument is well supported. *See generally* Corbo Decl. Indeed, Dr. Corbo provides excerpts from standard pharmaceutical texts and reference books that indicate that the use of a phosphate buffer was common industry knowledge. *See id.* ¶ 9. Dr. Corbo also provides specific evidence of the development history, including documented pilot and stability studies, of Ortho's phosphate buffer, *see id.* ¶¶ 10, 11 and 15, and swears that Ortho's reformulation of its buffer was not based on Merckle's formulation. *See id.* ¶¶ 16–18.

By contrast, Merckle's expert, Dr. Sewing, does not address whether the use of phosphate buffers was a novel concept in the industry and swears only to general "similarities" between Merckle's and Ortho's buffer. *See* Sewing Decl. ¶ 15. Dr. Sewing concludes that "it is most likely that exclusively the Merckle formulation served as the ideal model according to which the new Eprex formulation was developed." *See id.* ¶ 17.

At the summary judgment stage, the Court must view the record in the light most favorable to the non-movant. The nonmovant, however, may not "rest upon mere allegations" or "vague statements." *Quiroga,* 934 F.2d at 500; see Fed.R.Civ.P. 56(e). Here, Dr. Sewing's declaration and Merckle's corresponding argument are "not significantly probative" of whether Ortho altered its buffer based on Merckle's buffer. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. As a result, while the Court will deny summary judgment because of the absence of a litigation privilege, as discussed above, the Court concludes as a matter of law that Ortho's reformulation of its buffer does not constitute an actionable misappropriation of trade secrets. *See id.*

■ Finally, Merckle argues that Ortho's acts of obtaining the Merckle rHuEPO and protocol and commissioning and circulating the PRI and SRI reports give rise to a genuine issue as to whether Ortho detrimentally used Merckle's alleged trade secrets. In support of this argument, Merckle empha-sizes the unknown source of the Merckle information, the breadth of the SRI reports, and the content of the internal memorandum sent by the J & J legal department to Ortho affiliates that evidences the distribution of the PRI report and invites the "use" of the findings in the report. *See* Pl.'s Br. at 16, 25–26. Based on these facts, the Court agrees that a reasonable jury could conclude that Ortho used the reports, and the purported proprietary information contained therein, to Merckle's detriment. *See* Pl.'s Exs. 11 (PRI report); 13 (J & J legal department memorandum); 49 (SRI report); 50 (supplemental SRI report); Sytkowski Decl. ¶ 16, 20–24. Merckle will, of course, bear the burden of proving this fact at trial. *See Schmidinger,* 243 F.Supp. at 864.

For all these reasons, the Court cannot conclude at this stage that Ortho did not disclose or use Merckle's alleged trade secrets to the detriment of Merckle.

**C. Inducing a Breach of Confidentiality Agreement**

■ Ortho also moves for summary judgment on the claim that it tortiously interfered with Merckle's alleged confidentiality agreements. *See* Defs.' Br. at 30–32. Ortho contends that it is entitled to summary judgment solely because any interference with the confidentiality agreements was privileged. *See id.* For the reasons discussed above, the Court will not extend the concept of privilege to encompass Ortho's actions taken to pursue its commercial litigation against Merckle in Germany. Consequently, Ortho's motion for summary judgment will be denied.

**III. CONCLUSION**

For the reasons set out above, the Court will deny Ortho's motion for summary judgment. In particular, the Court concludes that genuine issues of material fact exist with respect to whether: (1) Merckle's purported trade secrets were, in fact, secret; (2) Merckle took reasonable precautions to protect the secrecy of its alleged trade secrets; (3) Ortho used Merckle's alleged trade secrets to Merckle's detriment; and (4) Ortho tortiously interfered with Merckle's confiden-

tiality agreements. These issues will be resolved by the factfinder at trial.

An appropriate Order is attached.

### ORDER

In accordance with the Court's Opinion filed herewith,

It is on this 15th day of April, 1997,

ORDERED that defendants' motion for summary judgment is denied.